JOHN G. CAPEZZUTO[1] vs. JOHN HANCOCK MUTUAL LIFE
INSURANCE COMPANY.

Suffolk. December 5, 1984. — April 3, 1985.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, LYNCH & O'CONNOR, JJ.

*Broker*, Commission. *Contract*, With broker.

A real estate broker was not entitled to a commission from the owner of cer-
tain property in a situation in which the sale of the property to a prospec-
tive buyer produced by the broker was defeated by the owner's decision
to convey the property to a third party where, although the broker had
produced a prospective buyer ready, willing, and able to buy on the
terms set by the owner, no binding contract of sale between the owner
and the prospective buyer had been executed, and where the record
permitted no inference that the owner had acted in bad faith. [402-405]

CIVIL ACTION commenced in the Superior Court Department
on May 18, 1981.

The case was heard by *James D. McDaniel*, J., on a motion
for summary judgment.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

*Philip J. Crowe, Jr.*, for the plaintiff.

*Donald R. Frederico* for the defendant.

HENNESSEY, C.J. In *Tristram's Landing, Inc.* v. *Wait*, 367
Mass. 622, 629 (1975), we set forth the prerequisites to a real
estate broker's recovery of its commission in a case where a
sale of real property was defeated by reason of the buyer's
withdrawal. In this case we are asked to apply *Tristram's
Landing* to a situation where the sale to the broker's client
falls through because of the seller's decision to convey the
property to a third party. We conclude, in the circumstances
presented here, that the prerequisites to the recovery of a com-
mission were not satisfied, and thus that the judge correctly
granted the seller's motion for summary judgment.

[1] Doing business as C & R Realty Company.

This action was brought by the plaintiff broker, John G. Capezzuto, to recover a brokerage fee from the defendant seller, John Hancock Mutual Life Insurance Company (John Hancock). The uncontroverted facts as established by the depositions submitted by the parties are as follows. On January 22, 1981, Stephen Kelly, the broker's agent, met with George Rowland, who managed John Hancock's wholly-owned properties, to inquire whether John Hancock owned any property that it wanted to sell. Rowland told Kelly that John Hancock was interested in selling a certain improved commercial lot on Route 128 in Dedham. Rowland further stated that John Hancock wanted to net $450,000 cash from the sale, and that any buyer had to be willing to close the transaction within sixty days. Kelly responded that Capezzuto would list the property at $550,000, and that, after Capezzuto took his commission, John Hancock would net in excess of $450,000.

Capezzuto then called his client Paul Hurlbert, who expressed an interest in the Dedham property. On January 23, Hurlbert signed a written offer to purchase the property, subject to financing, for $550,000, and he gave Capezzuto a $10,000 deposit. On the same day, Capezzuto gave the offer and the deposit to his agent Kelly, who in turn presented the offer and the deposit to Rowland at John Hancock. When Kelly presented the offer, Rowland indicated that he could not submit it to John Hancock's review committees because of the presence of the finance contingency clause. At this same meeting, Rowland also informed Kelly that he would be in communication with another broker, William Zielinski, and that he would give a client of Zielinski's a chance to make an offer for the property.[2]

---

[2] In 1980, Zielinski had arranged for his client Uniroyal, Inc. (Uniroyal), to purchase the Dedham property for $400,000. A purchase and sale agreement was signed, and Uniroyal paid John Hancock a $20,000 deposit. The transaction was never completed because Uniroyal's plans to resell the property fell through. Zielinski lost his commission and Uniroyal lost its deposit. At the January 23 meeting, Rowland told Kelly that, in light of Zielinski's past efforts, Zielinski would be given another opportunity to arrange a sale of the property.

On January 26, 1981, Capezzuto met with Hurlbert, who agreed to execute a new offer without the finance contingency. Kelly then telephoned Rowland and told him that he "had an offer coming in," which "would meet all [John Hancock's] criteria." Rowland again indicated that he would be discussing Hurlbert's offer with Zielinski. On January 27, Kelly telephoned Rowland again to tell him that Hurlbert's offer was signed, but that Hurlbert's attorney had wanted to review it before it was submitted. Rowland told Kelly to call him when Kelly was ready to deliver the offer, and, for the third time, Rowland informed Kelly that he was going to discuss the proposed sale of the property with Zielinski.

On January 28, Kelly made four attempts to telephone Rowland. Kelly was informed each time by Rowland's secretary that Rowland was unavailable. Kelly told Rowland's secretary that he had a written offer that he wanted to deliver, and he read the terms of the offer over the telephone. At some point on January 28, Rowland's secretary passed this information on to Rowland. On January 29, Capezzuto and Kelly met with Rowland in Rowland's office and presented Hurlbert's written offer. Rowland refused to accept it, on the ground that he had already accepted an oral offer from Zielinski's client, Uniroyal. On four separate occasions between February and July, 1981, Capezzuto submitted offers on behalf of Hurlbert, all of which were rejected by John Hancock.

On May 18, 1981, Capezzuto brought an action against John Hancock to recover the $55,000 broker's commission which he was allegedly owed.[3] The defendant moved for summary judgment, and on April 29, 1983, the motion was granted. The judge ruled that Capezzuto had not met the conditions set forth in *Tristram's Landing, supra*, for a broker's recovery of its commission. The Appeals Court reversed, holding that the rules set forth in *Tristram's Landing* did not apply to a case where the broker "produces a customer ready, willing, and able

---

[3] The plaintiff set forth claims based on G. L. c. 93A and on breach of the brokerage agreement. The judge granted summary judgment in favor of John Hancock on the c. 93A claim, and the plaintiff did not challenge this ruling on appeal.

to buy on the precise terms set by the seller but the seller has a change of heart or otherwise defeats the transaction." *Capezzuto* v. *John Hancock Mut. Life Ins. Co.*, 18 Mass. App. Ct. 46, 48-49 (1984). We granted John Hancock's application for further appellate review.

In *Tristram's Landing, Inc.* v. *Wait*, 367 Mass. 622 (1975), we adopted the following rule governing a broker's right to a commission. "When a broker is engaged by an owner of property to find a purchaser for it, the broker earns his commission when (a) he produces a purchaser ready, willing and able to buy on the terms fixed by the owner, (b) the purchaser enters into a binding contract with the owner to do so, and (c) the purchaser completes the transaction by closing the title in accordance with the provisions of the contract." *Id.* at 629, quoting *Ellsworth Dobbs, Inc.* v. *Johnson*, 50 N.J. 528, 551 (1967). There is no dispute, in this case, that these three prerequisites were not all met. There was no binding contract between the seller and the broker's client.

*Tristram's Landing* does, however, recognize an exception to these requirements. In circumstances where "the failure of completion of the contract results from the wrongful act or interference of the seller, the broker's claim is valid and must be paid." *Tristram's Landing, supra* at 629, quoting *Ellsworth Dobbs, Inc.* v. *Johnson, supra.* In *Lewis* v. *Emerson*, 391 Mass. 517 (1984), we applied this exception to uphold a broker's right to her commission. In that case, the broker had produced a buyer who was ready, willing and able to buy, and who had entered into a purchase and sale agreement with the seller, but the closing was prevented by the seller's default. *Id.* at 525. Capezzuto contends that this exception is also applicable here because the seller, John Hancock, thwarted the sale of the property to Hurlbert by conveying to a third party, Uniroyal. We disagree, and hold that for the broker to take advantage of this exception, the seller must have agreed to sell the property to the broker's client. Because John Hancock and Hurlbert never entered into a contract of sale, Capezutto is not entitled to his commission.

Capezzuto contends that a jury could have found that John Hancock did, in fact, orally accept Hurlbert as a buyer of the property. Even if it could be shown that there was such an oral acceptance, it would avail the plaintiff nothing. In order for Capezzuto to prevail, proof of a binding contract of sale between Hurlbert and John Hancock is necessary. See *Lewis v. Emerson, supra* at 524; *Tristram's Landing, supra* at 629. We add here that the uncontroverted record before us makes it clear that John Hancock did not even manifest an informal acceptance of Hurlbert. The deposition testimony of both Kelly and Rowland shows that, on January 23, John Hancock unambiguously rejected Hurlbert's offer because of the finance contingency. More importantly, on three occasions during the week that followed, Capezzuto's agent was informed by John Hancock that simultaneous negotiations were being conducted with another potential buyer. This testimony is completely inconsistent with any kind of acceptance of Hurlbert by John Hancock.

The rule we establish today, with respect to cases where the seller is responsible for "the failure of completion of the contract," *Tristram's Landing, supra*, is justified by the same considerations which motivated our holding in *Tristram's Landing*. "[O]rdinarily when an owner of property lists it with a broker for sale, his expectation is that the money for the payment of commission will come out of the proceeds of the sale." *Id* at 628, quoting *Ellsworth Dobbs, Inc.* v. *Johnson, supra* at 547. Furthermore, a seller ordinarily expects that he is free to sell to whomever he chooses, until he has signed a purchase and sale agreement. In particular, even where a seller engages more than one broker, the seller expects to pay only a single commission, since only one broker will be successful in procuring the ultimate buyer. To protect these expectations, we conclude that, in situations where the seller is responsible for the failure to complete the transaction, no commission is owing unless the seller has signed a binding agreement with the broker's client.

We acknowledge that brokers also have legitimate expectations, and that "if the broker brings the parties together on

mutually acceptable terms he expects a commission for his labor." *Stanchak* v. *Cliffside Park Lodge No. 1527 Loyal Order of Moose, Inc.*, 116 N.J. Super. 471, 479 (1971). Nonetheless, we conclude that the broker is in a better position than the seller to protect these expectations by including, in the brokerage contract,[4] a provision that the broker is entitled to its commission when it produces a ready, willing and able buyer whom the seller, for whatever reason, refuses to accept.[5] In the absence of such a provision the burden is rightfully placed on the broker, in light of the fact that "many sellers, unlike brokers, are involved in real estate transactions infrequently, perhaps only once in a lifetime, and are thus unfamiliar with their legal rights." *Tristram's Landing, supra* at 630.

We recognize that the rule we set forth today may not be applicable where the seller has engaged in bad faith dealing, or some other misconduct which prevents an agreement between the broker's client and the seller, see *Tristram's Landing, supra* at 629, or which suggests "a purpose on the part of the [seller] to obtain without payment a profit from the [broker's] exertions." *Bonin* v. *Chestnut Hill Towers Realty Corp.* 392 Mass. 58, 70 (1984), quoting *Kacavas* v. *Diamond*, 303 Mass. 88, 93 (1939). See generally *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 665-667 (1981). In this case, John Hancock accepted an offer which was, in fact, lower than that which was made by Hurlbert. The property was sold to Uniroyal only because of John Hancock's desire to give another broker, who had recently lost a commission when a sale of the same property had fallen through, a second opportunity to arrange a sale of the property. See note 2, *supra*. In short, on this record there could be no inference of bad faith. The defendant's motion for

---

[4] Massachusetts, unlike many States, does not require a signed contract to support an agreement to pay a commission to a real estate broker. See *Tristram's Landing, supra* at 630.

[5] A provision to the effect that a broker is entitled to its fee even when the buyer defaults "[i]f not fairly made, . . . may be unconscionable or against public policy." *Tristram's Landing, supra* at 630. See also *Ellsworth Dobbs, Inc.* v. *Johnson, supra* at 552-556.

summary judgment was properly allowed. The judgment of the Superior Court is affirmed.

*So ordered.*